**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY,

      *Plaintiff-Appellee,*

      v.

LAKIA C. ROBERTS,

      *Defendant-Appellant,*

      and

ATTSGOOD REALTY COMPANY;
STEWART D. SACHS, as trustee of
the assets of Dreck, Incorporated,

      *Defendants.*

      No. 10-1987

———————————————————

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,

      *Amicus Supporting Appellee.*

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

v.

LAKIA C. ROBERTS,

*Defendant-Appellee,*

and

ATTSGOOD REALTY COMPANY;
STEWART D. SACHS, as trustee of
the assets of Dreck, Incorporated,

*Defendants.*

No. 10-1988

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,

*Amicus Supporting Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:09-cv-02650-JFM)

Argued: December 7, 2011

Decided: February 3, 2012

Before WILKINSON and DUNCAN, Circuit Judges, and
Richard M. GERGEL, United States District Judge
for the District of South Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Gergel joined.

---

## COUNSEL

**ARGUED:** John Amato, GOODMAN, MEAGHER & ENOCH, Baltimore, Maryland, for Lakia C. Roberts. Regina Maria Policano, MIDKIFF, MUNCIE & ROSS, PC, Richmond, Virginia, for Pennsylvania National Mutual Casualty Insurance Company. **ON BRIEF:** Bruce Harrison Powell, LAW OFFICES OF PETER T. NICHOLL, Baltimore, Maryland, for Lakia C. Roberts. Kevin Thomas Streit, MIDKIFF, MUNCIE & ROSS, PC, Richmond, Virginia, for Pennsylvania National Mutual Casualty Insurance Company. Laura A. Foggan, Gregory J. Langlois, WILEY REIN LLP, Washington, D.C., for Complex Insurance Claims Litigation Association.

---

## OPINION

WILKINSON, Circuit Judge:

In this case, an insurer sought a declaratory judgment that it was required to indemnify its insured for no more than 40 percent of a state court judgment because it had covered its insured for no more than 40 percent of the time in which the state court plaintiff was exposed to lead poisoning. The district court agreed that the insurer was responsible for only a portion of the judgment, notwithstanding the fact that its insured was held jointly and severally liable for the entire judgment in the underlying state proceeding. The state plaintiff (and defendant in the federal declaratory action) appeals, and we affirm in part and reverse in part. The principle underlying our decision is a straightforward one: an insurance com-

Appeal: 10-1987    Document: 46    Date Filed: 02/03/2012    Page: 4 of 21

pany cannot be held liable for periods of risk it never contracted to cover.

## I.

### A.

From her birth on January 17, 1991 until 1998, Lakia Roberts resided at a house on 1740 East Preston Street in Baltimore, Maryland. In September 1992, when she was 20 months old, Roberts was diagnosed with lead poisoning. A test indicated that she had an elevated blood lead level of 28 micrograms of lead per deciliter of blood ("mcg/dL"). She continued to exhibit elevated blood lead levels until August 1995.

On February 4, 2005, Roberts filed a complaint in Maryland state court against Attsgood Realty Company alleging that the injuries she sustained from the lead poisoning were the result of its negligent management of the East Preston Street property. Attsgood had owned, leased, and managed the property from Roberts's birth until November 1, 1993, when it had sold the property to Gordon Gondrezick.

Attsgood then requested defense and indemnification from Pennsylvania National Mutual Casualty Insurance Company ("Penn National") under the terms of its insurance contract. In 1992, Penn National had issued a liability insurance policy to Attsgood covering the period from January 13, 1992 to January 13, 1993. The policy was later renewed to extend coverage to January 13, 1994. According to the terms of the contract, Penn National promised Attsgood that it would provide liability insurance for "Premises You Own, Rent or Occupy," including 1740 East Preston Street. From Roberts's birth in January 1991 until this coverage began in January 1992, Attsgood lacked liability insurance for the East Preston Street property.

PENNSYLVANIA NAT'L MUTUAL CASUALTY INS. v. ROBERTS        5

Under the contract, Penn National promised to "pay those sums that [Attsgood] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" as well as "defend any 'suit' seeking those damages." This guarantee was in turn qualified by a provision stating that "this insurance applies to 'bodily injury' and 'property damage' only if . . . the 'bodily injury' or 'property damage' occurs during the policy period." The contract also made clear that Attsgood's "rights and duties under this policy may not be transferred without [Penn National's] written consent except in the case of death of an individual [n]amed [i]nsured."

In accordance with the policy, Penn National agreed to defend Attsgood subject to a reservation of its rights. Attsgood then filed a third party complaint against Gondrezick seeking contribution and indemnification in the event that Roberts prevailed. After Gondrezick failed to appear or otherwise defend himself, the Maryland court entered an order of default against him in favor of Attsgood.

Following discovery, the state case went to trial on May 4, 2009 on counts of negligence and unfair trade practices. To prove the property owners' liability, Roberts's mother and her expert witness provided testimony indicating that Roberts had been exposed to lead poisoning at the East Preston Street property since her infancy and that this exposure had resulted in permanent brain damage. Attsgood in turn challenged the contention that the presence of lead at its property was the actual source of Roberts's injuries.

The trial ended on May 8, 2009. The jury returned a verdict in favor of Roberts for $2,000,000, which was reduced to $850,000 following an application of Maryland's non-economic damages cap. It is undisputed that Attsgood and Gondrezick are jointly and severally liable for this amount.

B.

On October 9, 2009, Penn National filed a declaratory judgment action against Attsgood and Roberts in federal court on the basis of diversity jurisdiction. The insurer sought a determination that it was obligated to indemnify Attsgood for no more than 40 percent of the total judgment, or $340,000. Penn National filed a motion for default judgment against Attsgood after it failed to respond. Penn National also filed a motion for summary judgment against Roberts arguing that it should be liable for only 22 months of the entire period of Roberts's exposure to the risk of lead poisoning. It calculated that while it had insured Attsgood for the 24 months from January 1992 to January 1994, Attsgood had sold the property to Gondrezick in November 1993, thereby resulting in a total of 22 months of coverage.

Roberts saw the matter differently. She argued that Penn National was responsible for paying the entire $850,000 judgment in light of "the joint and several liability of [its] insured." She also contended that even if the district court decided to allocate liability, "virtually all" of her "lead exposure occurred during Penn National's two policy periods," beginning with the discovery of her elevated blood lead level in September 1992.

The district court largely agreed with Penn National. Relying on *Mayor & City Council of Baltimore v. Utica Mutual Insurance Co.*, 802 A.2d 1070, 1104 (Md. Ct. Spec. App. 2002), the court observed that in lead paint or "continuous trigger" cases such as this, Maryland courts determine an insurer's liability through a "pro-rata allocation by 'time on the risk.'" Applying this method of allocation to the $850,000 judgment, the district court determined that the "evidence in the underlying litigation . . . established that Roberts was first exposed to lead paint when she was born on January 17, 1991." It then used August 1995, the month of Roberts's final elevated blood lead level, as the cut-off point for her period

of exposure. Based on these dates, the district court concluded that Roberts had been exposed to lead poisoning from January 17, 1991 to August 1995, for a total of 55 full months.

The district court then calculated Penn National's period of coverage. It concluded that Penn National provided insurance to Attsgood from January 13, 1992 to January 13, 1994, for a total of 24 months. The court rejected Penn National's argument that its period of coverage should be reduced to 22 months because Attsgood had sold the property to Gondrezick on November 1, 1993, concluding that while "under the terms of the insurance contract Penn National may be correct, the record is entirely barren of facts showing that Penn National's coverage in fact was terminated."

In its allocation of liability, the district court used the 24 months of coverage as the numerator and the 55 months of exposure to lead poisoning as the denominator to conclude that Penn National was responsible for 24/55, or approximately 43.6 percent, of the judgment. It then found that "Penn National is liable to Roberts for $370,600 (43.6% x $850,000), but no more."

## C.

Both Roberts and Penn National appeal from the district court's judgment. On appeal, Roberts advances two main arguments. She first contends that the district court erred in allocating Penn National's liability on a pro rata basis. She next argues that even if pro rata allocation was appropriate, the district court should have used the date of her first elevated blood lead level rather than her date of birth to calculate her period of exposure. For its part, Penn National challenges the district court's refusal to reduce its period of coverage to 22 months.

We review the grant of a motion for summary judgment *de novo*, applying the same standards as the district court.

Because jurisdiction here was founded on diversity of citizenship, we apply the same substantive law that a court in Maryland, the forum state, would apply if it were deciding this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). The parties do not dispute that a Maryland court would apply its own substantive law to the matter before us.

Applying Maryland law, we affirm the district court's judgment with respect to Roberts's two arguments. With respect to the matter raised on Penn National's cross-appeal, however, we reverse. We address these three issues in turn.

II.

Roberts first challenges the district court's decision to allocate Penn National's liability on a pro rata basis. Although Penn National insured Attsgood for only part of the time in which she was exposed to lead poisoning, Roberts believes it should be on the hook for the entire $850,000 judgment. The thrust of her argument is that Penn National contracted to cover the risk of any judgment against Attsgood for bodily injury, regardless of when it occurred, by promising to "pay those sums that [Attsgood] *becomes legally obligated to pay* as damages because of 'bodily injury.'" (emphasis added). In other words, "the contingency insured against" was not "injury to [Attsgood's] own person or property," but Attsgood's "risk of *liability* to another for personal or property injury." *See Sentinel Ins. Co. v. First Ins. Co. of Haw.*, 875 P.2d 894, 919 (Haw. 1994) (emphasis in original). Thus, Roberts contends, when Attsgood was held jointly and severally liable for $850,000 in damages, Penn National became contractually bound to pay the entire judgment. Despite its seeming simplicity, this claim suffers from three major problems.

A.

The first problem with Roberts's position is that it ignores the plain language of the insurance contract. But "[o]ur pri-

mary task in interpreting an insurance policy, as with any contract, is to apply the terms of the contract itself." *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000). Thus we must "look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage." *Id.* The terms of Penn National's insurance contract plainly indicate that it never agreed to cover the risk of the entire state judgment.

Penn National did not contract to "pay those sums that [Attsgood] becomes legally obligated to pay as damages because of 'bodily injury'" without qualification. Rather, it contracted to "pay those sums that [Attsgood] becomes legally obligated to pay as damages because of 'bodily injury' . . . *to which this insurance applies*." (emphasis added). The contract in turn makes clear that "[t]his insurance applies to 'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' *occurs during the policy period*." (emphasis added). By its own terms, the contract does not cover damages Attsgood became legally obligated to pay for injuries that occurred outside of the policy period. That fact is fatal to Roberts's claim that Penn National should be held liable for injuries that began before and continued after its period of coverage. "[C]ollecting all the indemnity from a particular policy [for an injury spanning multiple policy periods] . . . is not consistent with the language of the policies providing indemnification for . . . liability that resulted from an accident or occurrence '*during the policy period*.'" *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1103 (Md. Ct. Spec. App. 2002) (emphasis in original) (citation omitted).

Not only was Penn National's coverage limited to the policy period, it was also restricted to premises that Attsgood "Own[ed], Rent[ed] or Occup[ied]." This language precludes us from holding Penn National liable for injuries that occurred when Gondrezick, and not Attsgood, owned the house at 1740 East Preston Street. In seeking to impose the entire judgment

on Penn National, Roberts would have us turn a blind eye to these terms and hold an insurance company liable for risks for which it never contracted and for which it never received premiums. We decline to do so.

## B.

In addition to ignoring contractual language, Roberts's position conflicts with Maryland law. In lead paint or continuous trigger cases such as this one, Maryland courts engage in a "pro rata by time-on-the-risk allocation" of liability. *See Md. Cas. Co. v. Hanson*, 902 A.2d 152, 168 (Md. Ct. Spec. App. 2006) (quoting *Riley v. United Servs. Auto. Ass'n*, 871 A.2d 599, 611 (Md. Ct. Spec. App. 2005)); *see also In re Wallace & Gale Co.*, 385 F.3d 820, 835 (4th Cir. 2004) (holding that after *Utica Mutual*, "the pro-rata allocation method is correct under Maryland law"). Under this method of allocation, "[e]ach insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred" and "losses will be prorated to the insured" for periods during which it was uninsured. *Utica Mutual*, 802 A.2d at 1104 (emphasis in original) (citation omitted); *see also In re Wallace & Gale*, 385 F.3d at 833 ("The allocation of risk to the insured is for periods for which there is no insurance in force or for which there is no coverage by an insurance policy which is in force."). These cases prohibit us from holding Penn National liable for periods during which it did not provide coverage to Attsgood.

While Roberts concedes that Maryland courts engage in pro rata allocation, she contends that this method is inappropriate here. According to Roberts, Maryland courts use the pro rata approach only when allocating liability across multiple policy periods of a *single* insured. In support of this position, she points out that none of the previously cited Maryland cases involved more than one insured and argues that extending the pro rata approach to situations involving multiple tortfeasors (here Attsgood and Gondrezick) would allow an insurance

company to do an end run around the joint and several liability of its policyholder.

Like the district court, we find Roberts's proposed limitation "entirely unpersuasive." There is nothing in Maryland law to indicate it would abandon the pro rata approach and commitment to contractual language when multiple tortfeasors are involved. And those courts that have considered Roberts's argument have rejected it. Other jurisdictions that employ the pro rata approach do not suddenly change their method of allocation depending on how many tortfeasors are involved. *See Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir. 1980) (holding that when "allocating the cost of indemnification . . . [e]ach insurer is liable for its pro rata share" even if an insured is found to "be jointly and severally liable"); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740, 750 (Ill. App. Ct. 1996) (rejecting the "novel proposition that, because [an insured's] liability . . . is joint and several, the liability of the excess insurers cannot be apportioned on a *pro rata* basis") (emphasis in original). And even those jurisdictions that take a different approach recognize that the allocation of contractual liability cannot hinge on tort concepts. *See, e.g.*, *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 712 (Cal. Ct. App. 1996) ("The contractual obligations of insurers to a single manufacturer-policyholder are separate and distinct from the tort liability of multiple asbestos manufacturers to an asbestos claimant. No matter what the tort liability of an asbestos manufacturer—whether joint and several, proportionate to fault or proportionate to market share—the indemnity obligations of its insurers [do not change].").

The reason why Roberts's proposed distinction has failed to gain traction should be evident. The rationale behind the pro rata approach bears no relation to the amount of tortfeasors in a particular case. "At the level of greatest generality," the pro rata method is based on the fact that "[a]n insured purchases an insurance policy to indemnify it against injuries

occurring within the policy period, not injuries occurring outside that period." *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 322 (2d Cir. 2000). This explains why the pro rata approach not only allocates liability across multiple insurers of a single tortfeasor, but also "accommodates the need to hold liable those businesses that chose not to purchase insurance or coverage" by allocating liability to them for periods during which they were uninsured. *See Utica Mutual*, 802 A.2d at 1104. Pro rata allocation of liability is thus concerned with the length of a policy period, not the number of tortfeasors.

Ultimately, Roberts's proposed distinction stems not from a plausible approach to pro rata allocation, but from a conflation of tort and contract law. According to Roberts, the district court's decision to apply the pro rata approach here "effectively destroys the concept of joint and several liability." Appellant's Br. at 20. But as the district court noted, this argument "misses the point" because "[t]he law that applies to joint and several liability is entirely different, and separate and apart, from Maryland's pro-rata allocation law."

No one disputes that Attsgood and Gondrezick are jointly and severally liable and that each is responsible for the entire judgment under longstanding principles of tort law. *See Cooper v. Bikle*, 640 A.2d 1120, 1125 (Md. 1994). The question before us, however, is not whether Attsgood is liable for the entire $850,000 judgment, but whether Penn National is. And that question can be answered only by reference to the insurance contract, which necessarily involves the application of contract law. Consequently, fears of end runs around the tort doctrine of joint and several liability are not germane to our analysis. *See Outboard Marine Corp.*, 670 N.E.2d at 750 (holding that because "insurance coverage disputes are governed by contract law . . . [w]e can find no rationale to support the imposition of joint and several liability upon the insurers simply because [the insured's] liability [was joint and sev-

eral]"). We simply cannot distinguish away Maryland cases concerning contractual obligations on the basis of tort law.

## C.

While contractual text and Maryland precedent provide ample reason to reject Roberts's position, it is also worth noting that her approach to allocating liability would upend insurance underwriting. Not only is it "neither equitable nor fair to require an insurance company to pay for coverage during a period for which no effective coverage is in force," *In re Wallace & Gale*, 385 F.3d at 833, it is disruptive for insurance markets as well. As multiple courts have pointed out, Roberts's approach would impose the same amount of liability on an insurance company whether it provided coverage for one month or for 10 years. *See Forty-Eight Insulations*, 633 F.2d at 1225 ("Were we to adopt [the policyholder's] position . . . a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support such a result."); *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 939-40 (Colo. 1999) (observing that this position "creates a false equivalence between an insured who has purchased insurance coverage continuously for many years and an insured who has purchased only one year of insurance coverage").

The problem with such an arrangement is that it would discourage tortfeasors like Attsgood and Gondrezick from buying insurance. It is well settled that "the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover their risks," *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 992 (N.J. 1994), and this is precisely what Roberts's position would do. If Attsgood knew that Penn National would be forced to indemnify it against any judgment no matter how long it was insured, it would have little reason to purchase more than a year's worth

14   Pennsylvania Nat'l Mutual Casualty Ins. v. Roberts

of coverage. *Cf. Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1058 (D.C. Cir. 1981) (Wald, J., concurring in part) ("If the risk is to be shared only by the insurance companies [and not by manufacturing companies who were temporarily uninsured], a manufacturing company that purchased insurance intermittently during the risk period would be as secure as those prudent companies that continually purchased insurance."). Thus, Roberts's proposed rule would inevitably "reduce[] the incentive of . . . property owners to insure against future risks." *Owens-Illinois*, 650 A.2d at 992. And that reduced incentive would redound to the detriment of injured parties as well.

What is more, the uncertainty generated under this framework would impose significant costs on both insurance companies and their policyholders. At bottom, an insurance contract is an agreement to accept a premium in exchange for a contractually defined risk. If an insurance company cannot limit its risk to a defined period, it will be unable to determine the precise risks assumed under a contract, which in turn will prevent it from accurately pricing coverage. *See Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1392 (E.D.N.Y. 1988) (noting that an approach where "an insurer who was on the risk for a day but who then is burdened with the entire loss incurred over several years . . . cannot help correlate risks insured with premiums charged"). Not only will this hinder rational underwriting, but the higher premiums necessary to compensate for this rising uncertainty will be passed on to policyholders everywhere. Because we do not wish to force "insureds to bear the expense of increased premiums necessitated by the erroneous expansion of their insurers' potential liabilities," *see Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 541 (D. Md. 2008) (internal quotation marks and citation omitted), we refuse to adopt Roberts's approach.

### D.

We recognize that Roberts unfortunately may not be able to recover her entire judgment from either Attsgood or Gon-

drezick. It is a dispiriting but inescapable fact that sometimes really bad things happen, and those responsible are either insolvent or inadequately insured. But that regrettable reality does not allow us to ignore Maryland law, to hold an insurance company to a contractual provision to which it never agreed, or to scramble together whole areas of law that are conceptually distinct. The district court was right to allocate Penn National's liability using the pro-rata time on-the-risk approach.

### III.

Roberts also contends that even if pro rata allocation of liability is appropriate, the district court should not have used her date of birth, January 17, 1991, in calculating the period in which she was exposed to lead poisoning. She argues that it should instead have used September 1992, when she was 20 months old and diagnosed with lead poisoning, as its starting point in light of the testimony of her expert witness, Jaclyn Blackwell-White, M.D., at the state trial. Roberts points to Dr. Blackwell-White's testimony that Roberts's "lead levels themselves indicate that she was exposed, conservatively, . . . to lead from the age of 20 months on through to four years." She also points to Dr. Blackwell-White's observation that children often ingest lead by "pull[ing] up on window sills and . . . licking" them or by transferring lead dust and paint chips from their fingers to their mouths after "crawling on floors." In Roberts's view, that indicates she could not have suffered lead poisoning during her infancy because she could neither pull up on anything nor crawl about at that time.

Roberts's reason for pursuing a starting point of September 1992 is obvious. The district court found that Roberts was exposed to lead poisoning for 55 months and that Penn National insured Attsgood for 24 of those months. It accordingly held Penn National liable for 24/55 of the total judgment. Because the denominator drives the amount of Penn

National's liability, Roberts seeks to shrink it as much as possible in order to maximize her recovery.

We think, however, that the district court's decision to use Roberts's date of birth as the starting point was sound. Indeed it was based on the extensive evidence Roberts herself provided in the state trial indicating that she had been exposed to lead poisoning since her infancy. In contrast to her current position, Roberts presented evidence at the state trial indicating that it is quite possible for an infant to suffer lead poisoning. Dr. Blackwell-White, Roberts's own expert, testified that "lead on a developing brain" in "infants and toddlers . . . does significant damage," and that the "most critical age of the developing brain in a young child" for the purposes of lead poisoning is "birth through . . . five, six years old." The mere fact that children can ingest lead by pulling up on window sills or by crawling around says nothing about whether Roberts could have consumed lead as an infant through other means.

Moreover, the evidence presented at trial made clear that Roberts's living environment posed a significant risk of lead poisoning from birth. As her own expert, Dr. Blackwell-White, testified at the state trial, "the most common source of lead poisoning for children in urban areas like Baltimore" is "chipping, peeling paint in houses built before 1980," and that was precisely the threat Roberts faced at the East Preston Street property. According to the testimony of Roberts's mother, there was "chipping, peeling, or flaking paint on the exterior" of the house since the time she was pregnant and she had "to sweep up chips or flakes of paint" from the sidewalk near the front door on an almost daily basis. Roberts's mother also testified that there was "chipping paint" in the interior of the house "from the time before Lakia was born" and that "when Lakia was born . . . she ha[d] access to" areas where there was "chipping, peeling, or flaking paint." And Dr. Blackwell-White testified that "there was deterioration . . . throughout the house" after reviewing pediatric records noting

Appeal: 10-1987     Document: 46     Date Filed: 02/03/2012     Page: 17 of 21

the existence of "peeling, chipping paint" as well as the testimony of Roberts's mother that "part of the ceiling fell down."

Roberts also provided evidence in the state trial indicating that lead could be easily ingested, especially in an environment like the East Preston Street Property. As Dr. Blackwell-White testified, it takes as little "as a fingernail[']s worth" of lead dust or chips "to cause brain damage from ingestion," and Roberts's home contained far more readily accessible lead than that. Roberts's mother also testified that her daughter was "a thumb sucker" as a "young child," and it does not require a robust imagination to see how lead dust from a deteriorating house could get on an infant's fingers and then into her mouth. Given the nature of her living environment and the ease with which lead can be consumed, the likelihood of Roberts ingesting a damaging amount of lead in her infancy was particularly high.

In short, Roberts's current claim is belied by her position in the underlying tort action that she had suffered injuries from lead poisoning since at least her infancy. In state court, Roberts consistently took the position that her injuries began before she was 20 months old. In her complaint, for instance, Roberts alleged that she "was exposed to flaking, chipping and peeling lead paint and lead paint dust" from "[o]n or about 1990," the year *before* she was born. Then at trial, both her mother and her expert witness presented testimony indicating that Roberts had been exposed to lead poisoning since infancy. And her attorney argued at the state trial that "the biggest hit to . . . children['s] brain[s] . . . came from the first ten" mcg/dL of lead in the bloodstream. Throughout the state court proceeding, Roberts insisted that her worst injuries occurred well before she reached a blood lead level of 28 mcg/dL in September 1992. This strategy proved to be a winning one and Roberts ultimately obtained an $850,000 judgment.

But when it came time to divvy up that judgment, she changed her tune. Whereas at trial, Roberts went to great

18   Pennsylvania Nat'l Mutual Casualty Ins. v. Roberts

lengths to show that damage occurred in the earliest stages of her life, she now claims that her injuries began much later, in September 1992. But the judicial process is not some kind of game. If a litigant "assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). This doctrine, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). Whether judicial estoppel formally applies here is not a matter we need resolve, because at the very least Roberts's previous position undermines the credibility of her current argument. Indeed, the exhaustive foundation of her prior argument confirms our conclusion that her present claim lacks merit.

In sum, we agree with the district court that "Dr. Blackwell-White's own testimony" combined with the "argument made by Roberts'[s] counsel . . . in the underlying trial on the merits refutes Roberts'[s] present argument that her period of harmful lead paint exposure should be defined to have begun only in September 1992." And its determination that "the evidence in the underlying litigation, including the testimony of Roberts'[s] expert, . . . established that Roberts was first exposed to lead paint when she was born on January 17, 1991" strikes us as sound. We therefore affirm this aspect of the district court's judgment as well.

IV.

Finally, we turn to Penn National's cross-appeal of the district court's decision to hold it liable for 24 months of coverage rather than 22. Penn National has consistently argued that its coverage ended when Attsgood sold the East Preston Street

property to Gondrezick on November 1, 1993. While noting that "Penn National may be correct" that its coverage had ended "under the terms of the insurance contract," the district court nevertheless refused to reduce its liability because "the record is entirely barren of facts showing that Penn National's coverage in fact was terminated."

This view, however, cannot be squared with the terms of the insurance contract. Once again, we "look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage," *Cole*, 753 A.2d at 537, and if the "terms used in the insurance policy are plain and unambiguous, we will determine the meaning of the terms of the contract as a matter of law." *Clendenin Bros. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006) (internal quotation marks and citation omitted). Given the contractual language here, we have no authority to extend Penn National's coverage by an additional two months.

As the district court suggested, Penn National's coverage ended "under the terms of the insurance contract" when the property was sold to Gondrezick. There was nothing ambiguous about this aspect of coverage. According to the contract, Penn National promised Attsgood that it would cover "Premises You Own, Rent or Occupy." After Attsgood sold the East Preston Street property to Gondrezick, it obviously neither owned, rented, nor occupied those premises. Following the sale, the house at 1740 East Preston Street thus ceased to be property that Penn National insured under the contract.

Moreover, Penn National's insurance contract contained a non-assignment clause providing that Attsgood's "rights and duties under this policy may not be transferred without [Penn National's] written consent except in the case of death of an individual [n]amed [i]nsured." Given that an assignment of an insurance contract can "alter drastically the insurer's exposure depending on the nature of the new insured," *N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir.

1992), it made good sense for Penn National to require Attsgood to get its consent before transferring coverage. Attsgood and Gondrezick may have presented very different risks, and Penn National contractually reserved the right to refuse to insure the latter.

Here, there is no evidence that Attsgood assigned the remaining two months of coverage to Gondrezick upon sale of the property. Nor is there any indication in the record that Penn National gave consent to any assignment of coverage, calculated new premiums, or even knew of Gondrezick's existence. We thus cannot render the contract and its non-assignment clause a dead letter by holding Penn National liable for the conduct of a property owner from whom it had never received premiums and whom it never agreed to insure.

## V.

The law may not be difficult here, but the human costs incurred are undeniably hard. It is sad that Roberts may recover only partially on her judgment. The jury obviously believed this child suffered significant brain damage from lead poisoning and that Attsgood and Gondrezick were liable. The condition of the property and the failure to procure appropriate insurance were the property owners' responsibility. Roberts's misfortune cannot be laid at Penn National's feet, for that company has not disputed that it must pay that portion of the judgment to which its policy applied. To place the entire judgment on the insurer would be chaotic, rewarding those who decline to purchase adequate coverage and ultimately punishing those who do. This would lead in turn to more uncovered risks and lessened opportunities for the recompense of serious loss. For the reasons stated herein, Penn National is liable for 22/55, or 40 percent, of the $850,000 judgment. The district court's judgment is therefore affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Appeal: 10-1987   Document: 46   Date Filed: 02/03/2012   Page: 21 of 21

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*